CROSBY *v.* BUCHANAN.

1. A., in 1812, made a deed to V. conveying to him valuable estates, V. by a separate instrument, agreeing that if A. would, within five years, pay to him a certain sum ($14,500), he would convey to A.'s children, then infants, a part of this estate, and convey also to them a part of certain other estates.   Soon afterwards V. acknowledged that A. had paid to him a large part ($11,600) of the money to be paid.

On proceedings in equity many years afterwards, in the Circuit Court of the United States, the children, now become of age, prayed for—

1st. A cancellation of the deed by A., as having been fraudulently procured by V.

2d. That if this would not be decreed, then, on payment by the children of the balance with interest, for a specific performance by V. of his contract to convey the two parts of the estates which he had agreed to convey, if $14,500 were paid in five years.

3d. If the court would make neither of these decrees, then that it would decree that V. should refund with interest the $11,600 purchase-money that had been paid to him.

The Circuit Court in 1853 refused to decree a cancellation of A.'s deed, refused also to decree that V. should specifically perform his agreement to convey; but as to the return of the $11,600 purchase-money paid, the court said that it could not pass on that matter, proper parties not being before the court, and made no decree about it.   Proper parties came in, and after hearing, the court refused to order a return of the purchase-

money, and, finally, A.D. 1872, dismissed the bill by A.'s children. *Held*, That no "final decree" in the sense of the statute which authorized appeals from the Circuit Court to this court in the case of final decrees in equity was made in 1853, nor indeed before 1872; and that the decree then entered brought up the whole case; that is to say, brought up the question of cancellation, the question of specific performance, and the question of return of purchase-money.

2. Where the transactions out of which a case now before the court arose, occurred sixty-five years ago—litigation about them having been going on all the while—and the particular one before the court was begun thirty-five years ago, the court declared it to be high time that the case was ended, and that the court was not inclined to add to its length of years by looking after matters of mere form (objections of which were apparently now first made), in order to avoid substance.

3. In a court of conscience deliberate concealment is equivalent to deliberate falsehood. When a living man speaks in such a court to enforce a dead man's contract with himself against parties who he knows are ignorant of the facts, he must be frank in his statements, unless he is willing to take the risk of presumptions against him.

4. Accordingly where a party who has never been in possession comes into equity to enforce a deed for valuable estates made twenty-five years before, by the parents (now dead) of the persons now proceeded against, and which persons, when the deed was executed were young infants, has his bill answered by them, they stating that they were very young when the transactions relied on occurred, and that they had no personal knowledge about them, denying generally the allegations of the bill, suggesting many grounds for serious doubt as to their truth, and demanding of the claimant full and express proof of the fairness of the deeds, and of the full payment of the alleged considerations thereof, and of the circumstances of the execution of the deeds, it behooves the complainant, so far as he possibly can, to give such information, and if he shelter himself behind the mere execution of the deeds themselves, saying in his pleadings that he "cannot suppose that it will be necessary for him to allege or prove the payment of the consideration acknowledged in solemn form by the parties to the said deeds until the fairness of the transaction and fulness of consideration is impugned by proof," the court will hold that he has come before it with hands not clean, if in the progress of the case, and as things are developed, it turns out that he had agreed to reconvey part of the property, with other property, upon payment of a certain sum, and that he has acknowledged payment of a part of the sum, though he have agreed to convey only in case the sum were all paid within a certain time, and though he now aver, that in point of fact, the acknowledgment was made on a supposition that the person to whom it was paid would pay certain debts, which he failed to pay, &c. And the court will accordingly order the deed to him to be cancelled, and will not help him to obtain payment of even such minor claims as perhaps he really and justly had.

APPEAL from the Circuit Court for the Western District of Virginia. The case was thus:

William King, of Abingdon, a village of Washington County, in the southwest corner of Virginia—a man possessed of valuable brine springs, at Saltville, close by it, and of other large estate—died in 1808 childless, leaving a wife and eight brothers and sisters; among the brothers one named Samuel, and among the sisters one named Hannah, married to John Allen. He left also a nephew, William King, Jr.

By his will he devised the bulk of his estate, valued at about $500,000, to his nephew (the said William King, Jr.), on a condition which, as things turned out, proved impossible. The fact of the impossibility of the condition led at once to litigation, and in 1830 and 1836, the will in two different suits was the subject of construction in this court.

It was held in the first suit,* that the whole estate was devised to William King, Jr. (the nephew), subject to the life estate of the widow, but as it belonged to a court of chancery to determine whether he took the estate to his own use or in trust for the heirs of the testator, that question was left undecided. Accordingly, a bill in chancery was filed to test that question, and in that case, the second one, this court decided that he did take in trust for the heirs.†

Samuel King, and Mrs. Hannah Allen, the wife of John Allen, thus each became entitled to an eighth part of the estate. Samuel King lived at Somerset, a place in Pulaski County, in the southeast corner of Kentucky; Allen and his wife at Saltville. The two places were, perhaps, two hundred miles apart.

Independently of any general interest acquired as just mentioned by Samuel King in his brother William's estate, the brother by his will had made a special provision for him thus:

"I leave to the said Samuel, in case of personal application to

---

\* Finlay and Mitchell *v.* King's Lessee, 3 Peters, 346.

† King *v.* Mitchell, 8 Id. 326.

the manager at Saltville, or to my executors at Abingdon, on the 1st day of January annually, $150.   If not called for on that day to be void for that year.   Receipt to be personally given."

The testimony of different witnesses thus described Samuel King.

One said:

" He was notoriously and incorrigibly intemperate; though not often in such a condition that he could not go about."

Another said:

" I do not recollect that I ever saw him where spirituous liquors were to be had that he did not drink to excess."

A third:

" He was generally intoxicated; that is to say, generally speaking, when I saw him he was so."

A fourth:

"If I ever saw him sober, I have no recollection of the fact. He was in the habit of constantly drinking."

This Samuel King, as the testimony further showed, was not only intemperate but was always *considered* very poor. One witness, Mr. Fox, of Somerset, clerk of the County Court of Pulaski, Kentucky, thus testified:

" To the best of my recollection he was at all times in a manner destitute of any property or credit.   I well recollect that he applied to me as often as three times to borrow the sum of $5, each time, as he said, to defray his expenses to Abingdon, Virginia, where he was going to draw his legacy coming to him from the estate of his brother William King, which sums I lent him, he promising to refund the amounts upon his return, which, however, he never refunded."

Mr. Benjamin Estill, a lawyer, long resident in Abingdon, Virginia, said:

" He was believed to be totally insolvent for three years before his death, which event took place in 1812.   I have seen him several times in Abingdon applying for his annuity, and understood that he came on foot from Somerset in Kentucky, where he lived."

Besides being poor and given to drinking spirituous liquor in excess, there was testimony about him thus, and there was no testimony to contradict it.

One witness said:

"I always considered him as a very wild and visionary man, incapable of making bargains to any amount, when he had been drinking, and especially when there was any intricacy in the transaction."

Another said:

"I never saw him at any time in a condition when he could contract or trade to any advantage to himself or his family."

Additional witnesses confirmed this account of him; one saying:

"I never saw him after the death of his brother, that I thought him capable of transacting business of any kind. He ought to have had a guardian, and if he had been in the North would have had one."

We have mentioned that one of the heirs of William King, of Abingdon, was his sister Hannah, married to John Allen.

Allen's character was thus testified to.

One witness said:

"John Allen's general character as to correctness of dealing in money matters was bad. I am not able to say whether Samuel King was an easy subject for fraud. But Allen's general character was such that he would take advantage of any man if an opportunity offered, and he would do it so smoothly that the person imposed on would consider him a friend."

A second one said further:

"I was well acquainted with John Allen, and knew no good of him. I thought him capable of committing frauds of any enormity."

In addition to these two persons, connected, as we have said, by marriage with one another, and by their common right to participate in the large estate of William King, there appeared a third person, a principal actor in the con-

troversies, the subject of this report.   His name was John Vint, and he was entitled " of Washington City in the District of Columbia."

Vint was an Englishman, who came to the United States in 1800.   His relation to the parties connected with this suit begins about the year 1810, when he is found in intimate relations with Allen; but the mode of origin of his said relation was nowhere distinctly shown, nor with any detail.   His name was connected, in the present case, with large transactions.   How far property was traced with distinctness as being really his, so as to enable him to purchase in the way, as it will be seen in the sequel, that he alleged he truly did purchase in this case, will appear by the testimony which follows.

One witness said :

"I never saw him till he and John Allen came to purchase a negro girl I owned.   I knew nothing of his pecuniary condition. I was acquainted with Allen before.   I sold them the girl.   They never paid me."

Another witness, one Russell, said:

"In November, 1810, Mr. Vint had a store in the house of Mr. John Allen, and had there a considerable quantity of goods, which were said to be Vint's; but I do not recollect that I ever heard either Allen or Vint say that they belonged to Vint.   I was frequently at the store.   The shelves were pretty well filled with a good display.   I heard it spoken of about that time, that Vint had sold out to Allen.   Previous to that time Allen was frequently embarrassed, but as respects the condition of property I am not informed."

A third witness, Francis Smith, an attorney at law, who had married the widow of William King in 1811, but who testified that he had no interest whatever in the result of the suit, confirmed the view of these two witnesses:

"Previous to September 5th, 1812, there were placed in my hands for collection large claims on Allen.   I know that he was hard pressed long before in his pecuniary affairs, and that he was never able to purchase and pay $11,600 for any property.

He had nothing, and was able to purchase nothing.  About this time I frequently saw both Allen and Vint.  They were sometimes in jail and sometimes out.  I thought both of them without property or means."

A fourth witness, one Stout, however, testified in rather an opposite way.  He said:

" I recollect the sale by John Allen to John Vint of his interest in the estate of William King, for the sum of about $18,000.  I understood from John Allen that at the time of the sale he . owed to him, Vint, a small sum, about $2000, and that the balance of the purchase-money was paid by Vint in goods, which Allen afterwards told me he had received.  I farther know of my own knowledge that Allen did receive a great many goods from Vint."

However, as stated, *infra* (see p. 433), by Vint himself, this sum of $18,000 was not a true consideration.

We now return to Samuel King, already mentioned as intemperate, poor, and visionary.  We have stated that he lived in Kentucky and was obliged to come in the beginning of each year, in person, to Saltville or Abingdon, to give his personal receipt for the $150 left to him by his brother's will.  He came for the last time in January, 1812, when he claimed payment for two years.

A witness, resident at Abingdon, thus testified:

" When he came to Abingdon, he came to Allen's; Allen kept a public house.  He came there drunk, riding a little chunk of a pony, and dressed in a common dress.  He was almost always drunk during the time that he was there.  When he got to Abingdon he was asked by Allen's family how he had paid his expenses from Kentucky, and whether he had put up at private houses or at taverns?  He said that he had put up at any place that he could get in at, and told the persons with whom he put up that he would pay them on his return; for that he would get this year two years' payment.  Allen told him that he could get but one, for that he had not come for the last year's payment at the right time, and that under the terms of the will it was gone.  Allen's family told me that he was a poor man; and Mrs. Allen, his sister, told him in my presence to return to

his family, for that they would suffer in his absence. I thought him to be deranged from intemperance, and this opinion was entertained by the family of Allen generally."

Having got payment for either one or for two years, King set off on his pony to go back to his home, in Kentucky. He arrived at the house of a man named Pridemore, about sixty miles from Abingdon, to stay all night, and "while there," according to the language of a person who saw him, appeared "during the evening to be very uneasy, going frequently to the door in a state of alarm, and saying that he feared a man by the name of John Allen, and other persons who were following him from Abingdon, and that he would be assassinated." In the morning his hat and boots, pocket-book and saddle-bags were in his room, but he himself could not be found, and was never again seen or heard of. For some time grave suspicions of murder rested both upon Pridemore and upon Allen. But it finally rather appeared that King had gone out of the house in the middle of the night under the influence of *mania a potû*, and wandering through the forests thereabouts had fallen into a rapid stream, swollen by recent rains, and was lost among the gorges of the mountains which rise in that region. The whole matter, however, remained much a mystery.

His pony, saddle-bags, pocket-book, hat, and boots were sent back to his brother-in-law, Allen, by whose wife the saddle-bags and pocket-book were opened and examined. They contained papers but no money.

The unfortunate man himself left, at the time of his death, three children, aged respectively about one, three, and five years.

Allen died not long after, also leaving several children, all young.

We come now more particularly to certain facts of this case.

It seemed plain enough that on the 16th of November, 1810, Allen and wife executed a deed by which, for the *professed* "consideration of $18,901.27, current money, to them in hand paid," they conveyed to Vint all the right and in-

terest which the said Allen, in right of his wife, and also which his said wife had in the estate of the said William King, that is to say one-eighth part of that estate; and also a certain fifth part of the eighth of the estate which came to Samuel King as one of the heirs, which fifth the deed recited that the said Samuel had conveyed to Allen, who was to reserve it as a compensation to counsel, for services in the suits already mentioned at the beginning of the report of this case (page 422), brought to establish in effect an intestacy, and the rights of the heirs.

This deed had apparently been witnessed on the day of its date, November 16th, 1810, in the ordinary way, by three witnesses; but was not then acknowledged, proved, or recorded. On the 27th of April, 1812, fifteen months after the date of its execution, and as was specified on it, "at the request of Allen," its execution was attested *de novo* by two other witnesses. On the 7th of May following, it was proved for record in the way required by the laws of Virginia.

The scrivener who drew the deed testified that he drew it carefully; the transaction being large; but that he knew nothing about the true consideration of it.

It seemed further, plain enough, that on the 1st of January, 1811, Samuel King had executed a deed by which, for the *professed* " consideration of the sum of $10,000 to them in hand paid," he and *his wife* had transferred to this same Vint four-fifths of their interest in the estate of William King, brother of the said Samuel; the remaining fifth having, as the deed declared, been conveyed by them to Allen, in the way already mentioned, as compensation to counsel, in attending to the suits to establish the rights of the heirs.

The wife's execution of this deed, as it was produced, was by a mark. The execution of this deed was not witnessed, nor did the deed itself state where it had been executed, that is to say, whether in Virginia (at Abingdon or Saltville), where Allen lived, or at Somerset, in Kentucky, where King and his wife, the grantors, lived. But it appeared that on the 29th of January, 1811, that is to say twenty-eight days after the day stated in the instrument as the date of its exe-

cution, the instrument had been acknowledged by King and his wife in Somerset, Kentucky, where King and his wife lived, and by *King* then given to the recorder there for record, and afterward by the recorder returned to *King;* Vint not anywhere appearing in this transaction.

Pulaski County, in Kentucky, in which State the lands conveyed by this deed did not lie, was not the proper place for the record of the deed of King and wife to Vint. The deed was not proved in Washington County, Virginia, where the lands did lie, till the 25th of September, 1837.

With this statement by way of *proscœnium*, we will now state the pleadings and further developments in the case:

In January, A.D. 1825, during the pendency of the litigation in some of its forms, about the estate of the original owner of it, William King, who, as we have already said, died in 1808, a bill was filed in the Circuit Court of the United States by some of the heirs to obtain a partition of the lands not incumbered by the widow's life estate, and on the 25th of April, 1836, after the last of the decisions in this court, an order was entered appointing commissioners to make this partition. These commissioners afterwards made a report, and, among other things, assigned to the children and heirs of Samuel King, and the children and heirs of Hannah Allen, the wife of John Allen, one-fourth the property divided.

On the 24th of September, 1838, Vint filed an original bill against the heirs of Samuel King and the heirs of Allen and wife, in which he set forth substantially that each had become owners of one-eighth of the estate of William King, of Abingdon, and then alleged that he was the owner in fee of their interest in the estate. He stated that his title to the Allen interest and one-fifth of the King interest was obtained by the already mentioned deed from Allen and wife, dated November 16th, 1810, in which, for the consideration of $18,901.27, they conveyed the same to him; and that his title to four-fifths of the King interest was by the already-mentioned deed from King and wife, dated January 1st,

1811, in consideration of $10,000, executed and recorded in Kentucky. Of both these deeds, their tests, probates, &c., he appended copies to his bill. But he appended nothing else; nor did he state or intimate in the bill, or by anything appended to it, that the transactions were in reality in the least other or different than what a reader would infer from reading the two instruments themselves. He stated rather, on the contrary, that he did not desire a suspension of the proceedings in partition any further than was necessary to protect his rights, and *that he was willing to accept the lands set off to the heirs as and for his share.* And the prayer of the bill was to the effect that he might be substituted for these heirs in the partition proceedings, *and that whatever was assigned to them might be adjudged to him.*

In September, 1839, all the defendants answered the bill, and in substance stated that they were very young when the transactions referred to occurred, and that they had no personal knowledge as to the matters in controversy. They denied generally all the allegations in the bill adverse to their interests, and suggesting many serious grounds of suspicion against the validity of the claim of Vint, demanded from him full and express proof of all the material averments of his bill, and especially for proof *of the fairness of the deeds, and of the full payment of the consideration thereof, and of the circumstances of the execution of the deeds and the alleged payments.* The death of the widow of William King, the original owner, was also suggested, and the heirs of Samuel King stated that they had conveyed their interest to a certain Findlay.

On the 19th of September, 1839, Vint filed his supplemental bill, making Findlay a party, and also alleging the death of the widow, and asserting his right to the interest of Samuel King and Hannah and John Allen in the property devised to her for life and assigned to her for dower. In this supplemental bill he stated as follows:

"Your orator cannot suppose that it will be necessary for him to allege or prove the payment of the consideration, acknowledged in solemn form by the parties to said deeds, until the

fairness of the transaction and fulness of consideration are impugned by proof; but your orator asserts the payment of a full and fair consideration for their interests, which were then wholly contingent. Indeed, your orator was reduced from affluence to poverty by this very consideration paid for said interests. The deed from Allen and wife was duly admitted to record in the Circuit Court for Washington County, Virginia, on the 7th day of May, 1812, and the deed from Samuel King was duly admitted to record in the County Court of Pulaski County, Kentucky, where said Samuel King resided, on the 29th day of January, 1811, and on the 25th day of September, 1837, upon proof of the genuineness of said King's signature, the said deed was admitted to record in the County Court of Washington County, Virginia. . . . Your orator did not deem it necessary to prosecute his claim by suits until the suits should be determined in which the question was made whether William King, son of James King, took under the will of William King as devisee of his real estate, or whether it descended and passed to his heirs at law. It was, moreover, useless, and would have been premature to have asserted your orator's claim in the salt works and dower property until the life estate should be determined. Your orator is advised that he has been guilty of no laches from lapse of time, since he is in full time for the partition, which has not yet been made of any part of the estate."

To this supplemental bill Findlay answered, setting up his title under the conveyance from the heirs of Samuel King, and insisting upon several defences not now material to be stated.

After the filing of the supplemental bill much testimony was taken. On the 7th of February, 1840, Francis Smith, who married the widow of William King, the original owner, gave his deposition, and in it furnished a copy of a contract, as follows:

"This agreement, entered into this 6th of April, in the year of our Lord 1812, between John Allen, of the county of Washington, in the State of Virginia, of the one part, and John Vint, of the city of Washington, in the District of Columbia, of the other part, witnesses that the said John Vint, for and in consideration of the sum of $14,450, to be paid by the said John

Allen in the manner hereinafter mentioned, the said John Vint doth covenant and agree to transfer, make over, and convey to the *children* which the said John Allen now has and to such other *children* as he may have with his present wife Hannah, one-half of all the interest which he, the said John Vint, may have in the estate of William King, deceased, by a conveyance from John Allen and Hannah, his wife, bearing date the 16th of November, 1810, and also by another conveyance from Samuel King and his wife, bearing date the first day of January, 1811, reference thereto being had will more fully appear. It is further agreed that the said John Allen and the said John Vint shall contribute equal portions of the expenses which may necessarily be incurred in the prosecution of suits for the recovery of the estate aforesaid; but until the payment by the said John Allen to the said John Vint of the sum of $14,450, the said John Vint shall not be compelled to convey one moiety of his interest in the estate aforesaid to the children of the said John Allen by his present wife Hannah; and should the said John Allen fail to make the payment to the said John Vint of the sum aforesaid, for and during the term of five years from this date, then, and in that case, it is further agreed between the parties that this agreement shall be void and of no more effect than if it had not been entered into. Whereunto we have set our hands and fixed our seals the day and year above specified, in the presence of—

　　　　　　　　　　　　　　　　"JOHN ALLEN. [SEAL.]
"M. SHUGART.　　　　　　　"JOHN VINT.　[SEAL.]
"DAVID STOUT."

And afterwards a receipt as follows was discovered:

"Received of John Allen the sum of $11,600, it being in part pay of a contract entered into, it bearing date the 6th day of April, 1812, it being on account of the estate of the deceased William King. It being for the benefit of the said Allen's heirs, the 7th April, 1812.

"$11,600.　　　　　　　　　　　　　　"JOHN VINT."

This same witness, Francis Smith, testified further that having heard from Vint that John Allen, with whom he, Smith, had a quarrel, was about to perpetrate through forgery a fraud upon him, he got Vint to make a certain

affidavit. This affidavit was annexed to Smith's deposition, and, in the part material to this case, was thus:

"This day came John Vint before me, John Gibson, a justice of the peace for Washington County, Virginia, and made oath, that on the 16th November, 1810, he purchased *from John Allen* all his interest in the estate of William King, deceased, and after that purchased from *said Allen all the interest of Samuel King in said estate,* for which he was to have given, and did give, said Allen credit on a debt due from him to this affiant for $10,000; but that said Allen then stating that he wished the receipt executed by this affiant to be for a larger sum than the sum really given in order to promote his credit to the northward by the largeness of the payment he was making his creditors, this affiant agreed thereto, and executed his receipt for about $8000 more than the sum he was to give. Thus the business stood until April, 1812, when this affiant entered into another contract with said Allen in writing of that date, by which contract he sold and agreed to convey to the children of John Allen, by his wife Hannah, one-half of all his interest in William King's estate upon the payment by John Allen to this affiant of $14,000.

"JOHN VINT.

"Subscribed and sworn to before me this 5th September, 1812.
"JOHN GIBSON."

Other testimony was from time to time taken in the cause, and finally, in December, 1842, the heirs of Hannah and John Allen filed their cross-bill, in which they stated, that since the filing of their answers they had learned other facts most material in their character, and having an important bearing upon their rights and interests. They averred that these facts, "though necessarily well known to complainant (Vint), since he was an actor, and is the only surviving actor in the transaction, he has thought fit, from motives which cannot easily be misunderstood, to suppress." After referring to their extreme youth at the time the transactions occurred, and other circumstances likely to prevent their becoming acquainted with the facts, they set forth the foregoing contract and receipt, which had then recently been discovered in their search after the truth of the case. They

then charged that the failure of Vint to bring these matters to the knowledge of the court was such a fraud on them as must deprive him of the aid of a court of conscience in the premises, and claimed that under the circumstances of this case the payment of the balance of the purchase-money due upon the contract should be presumed.   They prayed:

1st. For a cancellation of the deed from Allen and wife to Vint; or,

2d. If that could not be granted, a specific performance of the contract; or,

3d. A return of the purchase-money shown by the receipt to have been paid.

To this cross-bill Vint answered in September, 1843.   He denied all charges of fraud and improper suppression of truth, and then said:

"The respondent fairly purchased and paid for the interest of John Allen and Hannah, his wife, and of Samuel King, in the estate of William King, deceased, and by deeds duly executed the said parties regularly conveyed their interest to him.   For these deeds reference is here made to the exhibits filed by this respondent to his original bill.   Some time after these purchases and the execution of said conveyances, it is true that this respondent did make with John Allen the contract of the 6th of April, 1812 (given, *supra*, pp. 431–2), but Allen did not pay him the purchase-money within five years, or at any time, and having failed to do so; the contract became void.   He admits the execution of the receipt, and alleges that beyond this there could be no pretence of any payment.   He denies that he received all the money mentioned in that.   He recollects distinctly that as part of the sum embraced in the receipt, a draft on John Jelf for $2333 was included, and that it was protested and never paid. A part of the sum also was made up of debts of Vint, which Allen assumed to pay for him but never did pay."

He then said:

"The contract on which the $11,600 aforesaid purports to have been paid and the receipt for that sum, were not retained by this respondent in his hands, as the complainants would seem to indicate, but were handed over to John Allen; and as the said

Allen and his heirs are interested in the said papers, this respondent supposed that they would take care of them, and at all times have them at their command. This respondent has certainly never had the said papers under his control, and this having been the case, it seems extraordinary to him that the complainants should gravely charge him with improperly concealing contracts and papers which they must have known were never in his possession."

On the 17th of April, 1844, Findlay filed his cross-bill against Vint, in which he asked that the deed from Samuel King to Vint might be set aside for fraud. In this bill he charged that the deed was obtained by the fraudulent combination of Vint and John Allen to divest King of his interest in the estate, and stated that proof had already been made in the case that Vint had said he purchased this interest from Allen. He then stated that the actual consideration for the deed was $6000, payable in ten equal annual instalments, for each of which a note was given. That none of these notes had been paid, and that Vint had nine of them in his possession. He charged that they were unfairly obtained by Vint, and probably in consequence of his dealings and combination with Allen. He called for an answer under oath.

To this cross-bill Vint filed an answer on the 8th of April, 1845, in which he adopted as part of it the answer which he had before filed to the cross-bill of Allen's heirs. He denied that the deed to him was obtained by fraud. He said that he could not undertake to say with certainty whether or not John Allen exerted any material agency in bringing about the sale by King, but denied all fraudulent combination for that purpose. He admitted that no money had been paid by him to King, and that the consideration was as stated in the cross-bill, and he appended copies of the ten notes. All of them were payable in negroes, in Abingdon, at cash price. The three first falling due were payable to King, *or his order.* The others to the *children of King by Patsey, his wife.* The execution of all was witnessed by John Allen. A receipt as follows was produced and made part of his answer:

"January 1st, 1811. Received of John Vint three notes, each $600, and seven notes to my heirs, each of them $600, and likewise a conveyance of all my right and title to the estate of my deceased brother, William King. Now, let it be understood, that I am to forward to John Allen, of Abingdon, said conveyance to said Vint, all my right and title to said estate, legally and completely done by me and my wife, or else said notes, in number, ten, amounting to $6000, payable by instalments, as the said notes will show, all of them and each of them to be void and of no effect if the conveyance is not forwarded in three months. If so the notes to be good.

"SAM. KING.

"Attest: JOHN ALLEN,
          HANNAH ALLEN."

He then said that in pursuance of this agreement King did execute the deed in Kentucky, and that under it he claimed title. He then said that Allen procured from King nine of the ten notes and delivered them to him, and that the amount of these notes was included in the receipt for $11,600, stated on p. 432, as part pay of the contract between himself and Allen, of the 6th of April, 1812; and that he received the notes in good faith from Allen, supposing that Allen had obtained them fairly from King. *The notes were yet unindorsed by any one.*

One of them—one of the three payable to King, and the one that first fell due—was assigned by indorsement made on it by King, and dated January 2d, 1811, to Allen, and by him to one Sheffey, who had been counsel for the heirs in their suits about the property of William King.

He appended to his answer three exhibits intended to show the state of accounts between him and Allen, April 6th, 1812. They are not necessary to understand the case as relied on by the court, which rests its judgment, as will be seen hereafter, on the leading facts of the case already disclosed. But they are specially adverted to in the argument of counsel for the defendants—the heirs of Mrs. Allen—who relied not only on the leading facts of the case but on the details of it, which, as they conceived, explain and heighten the effect of the leading facts. They are, therefore, here inserted:

## EXHIBIT No. 1.

ABINGDON, April 6th, 1812.

JOHN ALLEN TO JOHN VINT, DR.

| | | |
|---|---:|---:|
| To my note given to Francis West, for . . . . . | $300 | 00 |
| Interest up till this date, . . . . . . . | 42 | 00 |
| Do. three notes: one to J. Harper, one to R. Preston, and one to J. McCrab, amounting to $1133.34, which I lent my name for. At that time Mr. Allen had the money in his own hand, . . . . . . . . . . | 1133 | 34 |
| Interest on the above, . . . . . . . | 56 | 60 |
| Do. one note of mine which gave to Mr. Allen in favor of Samuel King for $600, which I paid Mr. Allen, 1st June, 1811; the said note was due the 1st day of January, 1812, . . . | 600 | 00 |
| Interest on the above note, . . . . . . | 34 | 00 |
| Do. I paid Mr. Allen the sum of . . . . . . | 166 | 00 |
| | $2331 | 94 |

JOHN VINT.

I acknowledge the above accounts to be just and true.

JOHN ALLEN.

## EXHIBIT No. 2.

"This agreement, made June 20th, 1812, between John Allen and John Vint, witnesseth, that the said Allen and Vint did agree on a settlement on the 12th of June, 1811, that the said John Vint did pay John Allen in full for four notes, mentioned. [The four notes to West, Harper, Preston, and McCrab, mentioned in the Exhibit No. 1, were here specified]; *and one note drawn by the said Vint in favor of Samuel King, for $600, due the 1st day of January,* 1812. The above notes, amounting to $1733.34, which I, John Allen, received pay in full for the above in full, from John Vint, on the 12th June, 1811.

"Now, if the said Allen pay and discharge the within debts, with all costs and interest accruing thereon, it will be good; if not, the said Allen doth agree that if the said Vint have to pay any of the within moneys, then it is further agreed that the said Vint is to be paid out of the estate of William King, deceased, the first that is recovered by law.

"JOHN ALLEN,
"JOHN VINT."

## EXHIBIT No. 3.

"April 21st, 1812. This is to certify that I received of John Vint one mare, for $166, on the 26th of October, 1811; also,

ditto, at error in calculating interest, to the amount of $200; the above sums amounting to $366; which sum is to be discounted out of the said Vint's receipt which he gave to my heirs on the account of the estate of William King, deceased.

"JOHN ALLEN."

Vint died in 1847, and the cause was afterwards duly revived; one Buchanan, his executor, being made a party in his stead.

The testimony being closed the cause was heard, and on the 24th September, 1853, a decree rendered:

1st. Annulling the deed from King to Vint and ordering a reconveyance; declaring that no conveyance was ever made by King to Allen of the one-fifth of his interest; adjudging costs in favor of Findlay and the heirs of King against Vint's representative.

2d. Denying the prayer of the cross-bill of Allen's heirs for a rescission of the deed from Hannah and John Allen to Vint; denying the prayer for a specific performance of the contract of April 6th, 1812.

3d. And ordering that the personal representative of John Allen be made a party, with a view to the determination of the question presented by the further prayer of the cross-bill for a return of the purchase-money paid upon this contract. The ground of this last order was that the court did not have before it all the parties necessary for the purpose of making a final disposition of the whole cause.

On the 21st of November, 1872, the cause was again heard and the cross-bill of Allen's heirs finally dismissed. From that decree this appeal was taken, by Crosby and others, Allen's heirs; the heirs and representatives of King being satisfied, of course, with what had been done in respect to them, and neither they nor the representative of Vint making an appeal.

*Messrs. J. A. Johnson and J. A. Meredith, for the appellant:*

I. *The court below as a court of equity, in which capacity it acted, had no jurisdiction.*

The bill of Vint does not ask partition, but refers to a

suit for partition pending in the same court, in which a division had already been made, and declares that the complainant is willing to abide by that division, and that the subject of controversy in the suit is the part of the estate of William King, of Abingdon, claimed by the descendants of Samuel King and Hannah Allen, &c. The bill, then, is an application on the part of Vint to a court of equity, to say whether he or the heirs of Samuel King and Hannah Allen had the better title to the real estate assigned to the said King and Allen in another suit. Vint was not and had not been in possession; his claim was not recognized as valid, but rejected as invalid by all the persons with whom he pretended to be tenant in common. Now, a bill which does not ask partition—which says it has been made in another suit—which asks the court to decide a question of right to a particular parcel of land—which prays that possession be given of what is held adversely by others—is in fact an action of ejectment and not a bill for partition. That must relate to an undivided estate, and must ask that the interests of each be separated from the others.

II. *But concede that jurisdiction exists, the decree below was wrong.*

1. *All Vint's bills should have been dismissed for laches.*

He obtained from King and wife their deed in January, 1811, and the deed from Allen and wife in April, 1812, but he did not institute this suit until September, 1838. In the meantime a suit was pending for the construction of the will of William King, upon which depended the value of the shares conveyed by these two deeds. He did not make himself a party to these suits, claiming the shares of Samuel King and Hannah Allen, but he remained passive and silent until Hannah Allen and Samuel King, and every living party to these transactions was dead but himself; and then, for the first time, asserts his claim.

2. *As to the merits.*

The only question is as to the Allen share; that is to say, as to Mrs. Allen's eighth part in her brother's estate. The deed of King conveying his eighth, has been decreed to be

fraudulent and null; and from this decree Vint's represen-
tative makes no appeal.    The fraud of Vint as to that part,
therefore, stands confessed.

Our allegation, however, is that the two deeds, and the
contract of April 6th, 1812, to reconvey on payment of
$14,450, and the receipt of April 7th, 1812, for $11,600
(*supra*, page 432), form parts of one transaction, and that
the deed from King having been decreed to have been ob-
tained by fraud, the other deed and papers fall as fraudulent
also.

On this account only do we advert to the now effete and
worthless deed from King and wife to Vint.

. Our allegation further is that Vint asserting a large, and
probably grossly excessive claim ($10,000) on Allen, for the
sale of store-goods to him, and Allen being insolvent or
nearly so, and meaning to put his own life estate in his wife's
eighth of her brother's property beyond the reach of cred-
itors other than Vint, these two persons—Vint and Allen—
entered into a fraudulent conspiracy by which,

1st. Vint should get, through Allen's efforts, King's eighth,
and cancel the debt of $10,000 which he alleged that Allen
owed him, and by which,

2d. Allen's life estate, under the devise of a provision for
his children, should be withdrawn from his creditors other
than Vint; and by which,

3d. Under the same device the interest of Mrs. Allen, the
owner in fee—an interest which neither Vint nor any other
creditors of Allen could touch—should pass to Vint as se-
curity for the payment of a balance due to him by Allen on
other accounts, and shown by the exhibits Nos. 1, 2, and 3,
*supra*, pp. 437–8.

We assert that the deed of King to Vint, dated January
1st, 1811, was procured by *Allen's* influence; that it was ex-
ecuted at Allen's house in Abingdon; that Vint's notes for
$6000, the consideration for it were left with Allen, until
the deed should be taken by King to Kentucky, be executed
and acknowledged there by Mrs. King, and be returned to
Allen; that Allen kept Vint's notes till January 1st, 1812,

that he then gave them to King; that King had them in his saddlebags when he was murdered or disappeared soon afterwards; that Allen then became repossessed of them and surrendered them, all except one (against which Vint was subsequently indemnified, in the way mentioned in Exhibit No. 2, *supra*, p. 437), to Vint, and that Vint thereupon cancelled his claim on Allen for store-goods; Vint thus getting King's eighth of the estate of the original owner, his brother, for nothing but his (Vint's) surrender of a claim of $10,000 on Allen, a man quite insolvent; a claim, therefore, which was good for nothing.

Now to prove our position.

The deed from King and wife to Vint bears date January 1st, 1811, on which day King was doubtless at Abingdon to get his annuity.   All Vint's notes, the consideration for the deed, are witnessed by Allen, who resided there, but who is not shown to have ever been in Kentucky.   One is transferred to Allen on the next day, January 2d, 1811.   The deed is not witnessed, because it purported to be by King and *his wife*, and the wife was not there to execute it.   It was acknowledged by King and his wife in Kentucky on the 29th of January, 1811, when obviously King had just returned home; and by *King* was then given to the recorder for record, and by the recorder after record returned to *King;* Vint nowhere appearing to have had possession or control of the instrument at all.   King in his receipt (*supra*, p. 436) promises to forward the deed when "legally and completely done" by him and his wife, to Allen; and Vint in his affidavit given to Francis Smith (*supra*, p. 433) says in terms, that "he purchased from *Allen* all the interest of Samuel King, for which he was to have given and did give said *Allen* credit on a debt due this affiant (Vint) for $10,000."

It is apparent, therefore, that Allen was the person who brought this conveyance and so-called sale about; that he did it by means of a deed made directly from King and wife to Vint, executed under pretence that King was about to get Vint's notes for $6000, which notes were doubtless left

in Allen's hands under a promise that they should become King's when the deed should come back or be brought back from Kentucky properly executed by the wife, and properly acknowledged; it having, however, been understood between Allen and Vint, that Allen would indemnify Vint against any liability on these notes, and that the true consideration was the surrender of the claim of $10,000 on Allen for store-goods sold in 1810 or thereabouts. There was no risk in this to Vint, for if he ever should be made to pay the notes, he had acquired an estate far above the amount of them; while as to his claim of $10,000 on Allen it remained where it was.

But the understanding between Vint and Allen *was* carried out. Vint did in a subsequent transaction with him, and where he paid really nothing for them, get back from Allen all the notes but one, and against that one he was indemnified, as appears by the Exhibit No. 2, *supra*, p. 437.

It may indeed be that, the *original* purpose as to King was but to get his one-eighth of an estate worth $500,000, for the grossly inadequate consideration of the ten notes payable through a term of ten years in negroes, and that the more shocking scheme which in April, 1812, was actually accomplished, was not devised until after Allen had got repossessed of Vint's notes after King's death. The exact time when the fraud actually perpetrated was concocted is not important.

We assert now further, that Allen after King's death became possessed of these nine notes of Vint by fraud.

Our theory is that the notes of Vint never left Allen's hands till January, 1812. It is not likely that Allen would have parted with the notes before the deed came back from Kentucky. Possibly the deed never did come back till King came back himself on the 1st of January, 1812, to get his annuity, and that he then brought it back himself. If King had received the notes prior to leaving Abingdon for his home in 1812, his family would have had them. He would not have brought them back to Abingdon January 1st, 1812. But the notes are found April 7th, 1812, in Allen's posses-

sion. How did Allen have them then? There is but one way of accounting for his possession of them. King, we know, disappeared—was murdered or destroyed himself—just after leaving Allen's house, in the beginning of 1812. Whether Allen murdered him or whether he destroyed himself will never be known with certainty, until that dreadful day when the secrets of all hearts shall be disclosed. But this we know now—that King's last utterances were that he " was afraid of a man named John Allen and other persons who were pursuing him." And if drink had made him mad it does not follow that in his idea there was not a truth "that often madness hits on which reason and sanity could not so prosperously be delivered of."

But whether Allen murdered King or not, we know that King's saddlebags, containing papers, were sent, not to his own family in Kentucky, to whom they ought to have been sent, but to Allen's family at Abingdon. What papers were these? As King is shown to have possessed no other property than Vint's notes, and as these notes never came to the possession of King's family, and as on the 7th of April, 1812, they are found in Allen's possession, the presumption is violent that the papers were nine of Vint's notes given for the purchase of King's eighth. The tenth one Allen had already by King's indorsement.

We now come to the 6th of April, 1812, and more particularly to the Allen eighth. Possessed of these notes of Vint, in the spring of 1812, and King's deed to Vint having been duly executed and acknowledged, Allen is ready to carry out with Vint a full scheme; whether one devised originally to the full extent in which it was now executed, or in that full extent now first conceived and carried out, is unimportant.

And here it is to be noted that the deed of Allen and wife to Vint, though executed November 16th, 1810, does not appear to have left Allen's possession at that time. It was not acknowledged at that time, nor then recorded. On the contrary, on the 27th of April, 1812, eighteen months after its execution, two new witnesses attest it at the request of

*Allen;* and it is not proved for record until the 7th of May, 1812.

At this time Allen was not indebted to Vint except in a small amount shown by the Exhibits Nos. 1, 2, and 3. Vint admits in his affidavit made for Francis Smith, that his claim of $10,000 had been paid by Allen's sale to him of King's eighth.

The parties, therefore, except as to a small debt from Allen to Vint, as shown by Exhibits Nos. 1, 2, and 3, were unindebted to each other; each with one-eighth of the original estate, but Allen holding in his own hands a deed by which he conveyed his and his wife's eighth to Vint. The parties were confederates, and dependent on each other. Each knew the fraud of the other. They now fell upon this device. Allen delivers to Vint the deed from himself and wife, conveying their interest to Vint, *in consideration whereof* Vint executes the contract of the 6th of April, 1812, by which Vint agrees to convey to the children of John Allen and Hannah his wife " one-half of all the interest which he, the said John Vint, may have in the estate of William King, deceased, by a conveyance from John Allen and Hannah his wife, bearing date the 16th day of November, 1810; and also by another conveyance from Samuel King and wife, bearing date the 1st day of January, 1811."

Vint did not stipulate to reconvey to Allen's children the same interest that had been conveyed to him by Allen and wife. If he had done so, the fraud would be apparent upon the face of the two papers. But as this contract bore date two years subsequent to the date of the deeds, it had the appearance of a new contract, one distinct from that of the deeds; and as this appearance would be strengthened by the conveyance of a different interest, they fell upon the device of conveying to the children a moiety of each of the interests conveyed to Vint by each of the two deeds. They sought to strengthen further this appearance of fairness by the nominal consideration of this contract. It will be observed that the consideration to be paid Vint by Allen is $14,450.63, which is precisely the half of the two sums men-

tioned in the two deeds as their respective considerations.* The contract contained a clause that there should be a forfeiture of the contract if this sum was not paid in five years.

If the arrangement had stopped here Allen would not have got anything. Before he could have demanded the reconveyance, he would have had to pay $14,450.63, the estimated value of the interest. It would have been better for him, instead of doing this, to have permitted his life-interest to be taken by his creditors; since the fee simple would have still remained to his children through their mother. It became necessary then to resort to another device to relieve Allen of this dilemma; and the device resorted to was this. Vint on the 7th of April, 1812—one day after the date of the contract—gives a receipt to Allen for nearly the whole amount of the nominal consideration; acknowledging the receipt of $11,600, in part pay of the contract entered into on the preceding 6th, and declaring it to be on account of the estate of William King, deceased, and for the benefit of John Allen's heirs.

It is admitted by Vint that the amount of nine of the notes given by him to King and now surrendered by Allen, was included in the $11,600, and that he supposed that Allen came by them honestly. That this is false is plain. The notes were unindorsed by any one. As to those payable to King's children, as the children were infants, they could be assigned only by order of court. When Vint received the notes he must have known them to have been stolen. Allen was the thief and Vint was the receiver of the goods.

But to resume our history. After deducting the amount of the receipt from the nominal consideration expressed in this contract, there then remained a balance due from Allen, which he would have to pay before he could demand a conveyance from Vint of the interest stipulated for in the contract of 6th of April, 1812. The reason why the receipt did

---

* In the deed from King to Vint, the consideration is the sum of $10,000. In the deed from Allen to Vint, the consideration is the sum of $18,901.27; the one-half of which is $14,450.63, the consideration named in the contract of the 6th of April, 1812.

not cover the whole nominal consideration, but left this balance due, is explained by the circumstance that Allen was indebted to Vint on other transactions, which amounted to nearly this balance, and which were produced by Vint on that day in an account rendered, and dated the 6th of April, 1812, the date of this contract, with the interest calculated on the several items down to that day, which amount was acknowledged by Allen to be due. See the Exhibit No. 1, *supra*, p. 437. The amount due on this account added to the amount due on another account settled between the same parties, amounted to about $2600 (as appears by the Exhibit No. 3, *supra*, pp. 437–8), leaving a difference between this sum and the balance due as aforesaid on the nominal consideration of the contract of 6th April, 1812, of about $250. This difference was made by Vint, doubtless, with the intention to cover the interest that would accrue on the sum actually due between this day and the time when he would receive enough from William King's estate to pay it. By thus retaining this balance on the nominal consideration of this contract, it furnished Vint security for the amount really due him from Allen on these other transactions, and forced Allen to pay it before he or his children could get anything from the estate of William King under the contract of 6th April, 1812. This debt of Allen to Vint is again acknowledged by Allen on the 20th June, 1812, in Exhibit No. 2, *supra*, p. 437, and a lien given on his interest in William King's estate. He then had no interest except that secured by the contract of 6th April, 1812.

The case establishes, we submit, the following conclusions:

That the deed of Allen and wife was not delivered to Vint until the contract of the 6th of April, 1812, and the receipt dated on the next day, were signed and delivered by Vint to Allen, and Allen delivered to Vint the notes which Vint had given to King; that the interchange of these papers was contemporaneous, and consequently that the said contract and receipt and the delivery of said bonds constitute the real consideration of the deed from Allen and wife to Vint; the consideration consisting in part of King's interest, pro-

cured by the combined fraud of Vint and Allen, which renders the deed from Allen and wife to Vint fraudulent and void. The extent to which this interest of King formed a part of the consideration, is not to be measured by the moneyed value of that interest at the time. It was the controlling inducement which led to the delivery of Allen's deed and the execution and delivery by Vint of this contract and receipt.

That no moneyed consideration passed between two such men as Allen and Vint is palpable, and is admitted by Vint in his answers to the cross-bills, though in his original bill he avers that the deed from Allen and wife was " for the consideration of $18,901.27," and the deed from King and wife was "for the consideration of $10,000." He thus proves his own averments to be false. Vint has, in fact, offered no explanation as to the true consideration of that deed, but has contented himself with a vague and general averment in his answer, that he fairly paid for the interest of John Allen and Hannah his wife; and this averment is made in response to special and searching interrogatories, calling on him to state the true consideration of this deed. This evasive answer, this ominous silence, should condemn the whole transaction, and stamp it with the fraud charged in the cross-bill, and not explained by a party cognizant of every circumstance, and the only party to these transactions then alive, and alone able to give the explanations called for. This, in a court of equity, is an admission of the fraud charged. To this should be added the facts that he suppressed the contract of the 6th of April, 1812, and the receipt of the 7th of that month, and claimed the whole of these two interests in his original and supplemental bills; and that every living party to these transactions, except Vint, was dead, when he filed his bill, twenty-seven years after the transactions occurred, asserting claim under the deed from Allen and wife and King and wife.

*Messrs. H. H. Wells* and *L. H. Chandler, contra:*

I. *As to jurisdiction.* Vint's title at the outset depended

upon the construction of a trust exclusively within the juris-
diction of a court of equity. The relief which he asked was
a partition and a restraining order or injunction against the
assignment of any portion of this estate to the heirs-at-law
of King and Allen. The established rule is that it is not
enough that the party has a possible remedy at law, or even
a convenient remedy, but that to divest the equitable juris-
diction of the court, the legal remedy must be an adequate
one, and it must be as convenient as the remedy that a court
of equity affords.* In fact, as Vint's title was but equitable
—the legal estate having been decided by this court to have
been in the nephew†—he could not have maintained eject-
ment.

In addition, the case does not stand upon the original and
supplemental bill, but the defendants have filed cross-bills,
impeaching for alleged fraud the conveyances under which
the complainant claims. The complainant has answered.
Issues peculiarly appropriate for chancery have thus been
raised by the families of Samuel King and Mrs. Allen.

II. *Assuming that jurisdiction to review exists, how much of the
case below is to be reviewed?* No part, we suppose, but that
relating to the purchase-money paid upon the contract of
April 6th, 1812; the question whether it was paid. The
decree made in 1853 was final. It decreed that the deed
from Allen and wife to Vint, dated November 16th, 1810,
was valid; that the deed from King and wife to Vint, dated
January 1st, 1811, was void, and denied the prayer of the
cross-bills for specific performance of the contract between
Allen and Vint dated April 6th, 1812. Those were the
only questions which the pleadings, as they then stood, did,
or could in fact raise. No other question touched in any
manner the title to the property, nor has any question since
been presented affecting that title. In short, the decree of
1853 decided the right of property in contest, and no appeal
having been taken from that decree for nineteen years, this

* Oehlricks *v.* Spain, 15 Wallace, 228; Boyce *v.* Grundy, 3 Peters, 215.
† See *supra*, p. 422.

court is now without jurisdiction to review it.*    The complainant was entitled to have that decree immediately carried into effect.

III. If, however, the decree of 1853 was not final, and the same, so far as respects the Allen part, is now subject to review, we say that there was no error in the decree.

1. There were no unexplained *laches.*

Until the determination of the question, whether Samuel King and Hannah Allen took any estate under the will of their brother, there was no necessity, nor any propriety, in fact, in Vint's instituting a suit to recover the property.

In the ascertainment of that question there was no delay, because a suit was pending and not decided, in this court, until 1830. Vint did not make himself a party to that suit, and could not, because it was an action of ejectment to recover possession of a definite portion of the estate which had not been apportioned or divided, and in which Vint had no right to any particular part; nor was there any necessity that he should do so, because the suit being between parties from whom Vint, Allen, and King's heirs alike claimed title, they were all privies, and would be bound by the judgment of the court therein.   ·

2. *As to merits.*    The whole of the opposite case rests on the assumption that King was at Abingdon January 1st, 1811, under Allen's influence, and that Allen by fraud and duress coerced him to make the deed to Vint.   But—

1st. When King came, in 1812, to claim his annuity, he claimed annuity for two years; one due January 1st, 1811, and the other due now, January 1st, 1812; and Allen told him that under his brother's will he could not get the one for January 1st, 1811, because he had not then claimed it. The fact that he did not claim it on the 1st of January, 1811, tends to show that he was not at Abingdon at that date.

2d. The deed made January 1st, 1812, is by Samuel King and *his wife.* It is not shown nor alleged that she then or ever left her home in Kentucky.

---

* Thompson *v.* Dean, 7 Wallace, 342; Railway Co. *v.* Bradley, Ib. 575; Stovall *v.* Banks, 10 Id. 583.

The case of the opposite side assumes, in addition, an enormous scheme of fraud. When such a scheme is relied on—a gigantic scheme, involving an immense mechanism, carried on by two parties through two or three years—plain proof should be made, at least of the leading facts. Such proof is not made. Because such a scheme is imaginable by an active fancy and is actually imagined by the opposite counsel, it does not follow that Vint and Allen imagined it, still less that they carried it out.

Reliance is placed in the argument of opposite counsel upon the fact that Vint "suppressed"—that is to say, that he did not produce and set forth in his bill—the contract of the 6th of April, 1812, and the receipt of the 7th, and that he claimed the whole of the two-eighths.

The argument assumes that those two papers not only were really, but also that they were known and felt by Vint to be, at the time that he filed his bill, still operative and obligatory papers; assumes, in other words, that he meant in filing his bill to commit a fraud. But is not that a matter to be proved? By the terms of the contract the rights of Allen's children under it ceased, unless the contract on their side was carried out within five years; that is to say, unless it was carried out by the year 1817. Was it, in truth, A.D. 1838 an obligatory paper? The question raised one of the nicest points in scientific equity; that is to say, how far time is of the essence of a contract? The general rule is that a party who comes into equity to enforce a contract must not have been guilty of laches, and that on the contrary he must have shown himself "ready, desirous, prompt, and eager." There was raised, in addition, and independent of the matter of time, the difficult question of mutual and dependent covenants; and how far the failure of Jelf to pay his note for $2333, which had been received at the time as cash, and how far the failure of Allen to pay certain debts of Vint's which he had promised to pay for him, reduced the receipt of April 7th to nothing. These things, according to Vint's answer to the cross-bill of Allen's heirs, largely made up the receipt. Was Allen, in filing a bill A.D. 1838,

plainly and necessarily bound to know and to feel that the paper still bound him? If he was not, he was not bound to say anything about it. A pleader is expected to state his own case, and to state it as strongly as he can. He is not bound to anticipate all objections to it and then to show those objections to be unfounded. Suppose that in fact the contract did not, owing to lapse of time, bind him when he filed his bill. What would have been thought of a bill which, after setting out the deed to Vint, then added: "It is true indeed that there was a contract? &c.;" . . . and, after setting out the contract *in extenso*, then went on to show perhaps *in extensiori*, for each severally, a hundred and one reasons why it had no longer any force? Who ever heard of such pleading, either at law or in equity? It would have been in plain violation of the fundamental rules of pleading; rules as ancient as the common law itself,* and taught in elementary text-books.† When treating "Of the Principal Rules of Pleading," Serjeant Stephen gives one thus:

"3. *It is not necessary to state matter which would come more properly from the other side.*"

And, commenting on it, says:

. " The meaning is, that it is not necessary to anticipate the answer of the adversary; which, according to Hale, C. J., is 'like leaping before one comes to the stile.'‡ It is sufficient that each pleading should in itself contain a good *primâ facie* case, without reference to possible objections not yet urged."

The transactions to be passed on are very ancient, complicated, and obscure. Matters may have got mixed up. The consideration of one deed may have been mistaken for that of another. Vint's notes were perhaps not the consideration for the deed from King. Proofs cannot be given as of recent things. It is plain, however, that Vint did have property in 1810; a large assortment of store goods. The

---

* See Stowell *v.* Lord Zouch, Plowden, 376; St. John *v.* St. John, Hobart, 78; Holham *v.* East India Company, 1 Term, 638.

† Stephen on Pleading, Tyler's edition, Washington, 1871, p. 315.

‡ Sir Ralph Bovey's Case, 1 Ventris, 217.

witnesses, Russell and Stout, both prove this by their testimony, *supra*, pp. 425–6. Allen was reported to have bought these goods. No doubt he did. It is plain, too, that they had other transactions. The exhibits, Nos. 1, 2, and 3, *supra*, pp. 437–8, show this. Suppose that Vint was at one time in jail. Does that prove that he may not have previously had control over a large amount of goods and sold them to Allen? He may have been imprisoned for the price of those very goods. And how does the fact that Allen was in jail with him bear on the case? it being confessed that Allen owned a life estate in his wife's eighth of her brother's estate, and that she owned the fee, and both having conveyed to Vint?

Even if Vint had wanted candor in not stating the fact of the contract and receipt, of April 6th and 7th, how does that show that the deed of the 6th was without consideration?

The CHIEF JUSTICE delivered the opinion of the court.

The first question we are to determine is as to the extent of our power over the several orders and decrees of the court below. The appellees claim that it is confined to an examination of the question of the return of the purchase-money paid upon the contract of April 6th, 1812, while the appellants insist that the appeal reaches back and includes the decree of September 24th, 1853, so far as it relates to that part of the case in which they are interested. All agree that our inquiries are limited to the Allen title. The King title was disposed of adversely to the appellees in 1853, and they have not appealed.

In 1853 the court determined that it would not decree a cancellation of the Allen deed, and would not order a specific performance by Vint of his contract. This determination it caused to be recorded, but at the same time declared that it could not then make a final disposition of the whole cause, because it did not have before it all the parties necessary for that purpose. In 1872, when the cause was ready for final hearing, the court accepted this recorded opinion

as settling the rights of the parties, so far as it went, and then proceeded to consider the question which had not been determined.  Upon this hearing that question was decided against the complainants in the cross-bill, and then a final decree was entered denying the relief asked by the defendants.  This ended the case in the court below.

Cases cannot be brought to this court upon appeal in parcels.  We must have the whole of a case or none.  The court below must settle all the merits before we can accept jurisdiction.  Appeals will lie, as has been frequently held, when nothing remains to be done except to enforce and give effect to what has been decreed, but until all the rights of the parties have been finally passed upon and settled this cannot be the condition of a cause.  Nothing must be left below when an appeal is taken but to execute the decree.

That was not the condition of this case in 1853.  An appeal then would have left the question of the return of the purchase-money undetermined.  The rights of the parties as presented by the pleadings were not all settled.  The powers of the court below were not all exhausted.  If the remaining question had been settled in accordance with the prayer of the cross-bill the present appellants might have been satisfied and the appeal saved.

We are, therefore, of the opinion that the decree of 1853 was not final so far as it respects the Allen title, and that the appeal brings up the whole of that part of the case for our consideration.

It is first insisted by the appellants that a court of equity has no jurisdiction of the case, and that for this reason the bill should now be dismissed.

So far as we can discover from the record, this objection is raised here for the first time.  The transactions out of which this case arises occurred sixty-five years ago, or thereabouts.  The estate of William King has been the subject of litigation in some form or other during all that time.  This particular suit was commenced thirty-six years ago and more.  It is high time it was ended.  At any rate, we

are not inclined to add to its length of years by looking after mere form in order to avoid substance.

This brings us to the case upon its facts. The record is voluminous, but to our minds the controlling facts are few. In a court of conscience deliberate concealment is equivalent to deliberate falsehood. When a living man speaks in such a court to enforce a dead man's contract with himself against parties who he knows are ignorant of the facts, he must be frank in his statements, unless he is willing to take the risk of presumptions against him.

In this case Vint waited until both Allen and his wife were dead before he attempted in any manner to assert his claim. This he had the legal right to do. His laches is not a bar, but it is still a fact, and when it is remembered that some of the parties he is now pursuing were not born until after his rights, if any he has, accrued, this silent fact has all the effect of positive statement.

The rights of Samuel King's heirs are not before us for adjudication, but the facts upon which their rights depend cannot easily be separated from those we must consider.

Allen and Vint seem to have been almost inseparable when the transactions we are to pass upon occurred. King was a man of intemperate habits. His brother, William King, from whom the property in controversy came, made provision in his will for the payment to him of the sum of $150 annually, so long as he lived, in case he applied for it personally to the manager of the salt-works at Saltville, or the executor of the will at Abingdon, on the first day of January in each year. His personal receipt was required, and the payment for the year was to be forfeited if not called for on the day.

He lived in Kentucky, and Allen and Vint at Abingdon. His contract to sell to Vint bears date January 1st, 1811. That was the day he was required to be at Saltville or Abingdon to receive his annuity. The contract was witnessed by Allen and wife, and the notes given for the purchase-money, all bearing that date, were witnessed by Allen.

The note first falling due was assigned by him to Allen on the 2d of January, 1811, the day after its date. From these admitted facts the conclusion is irresistible that King was in Virginia when the contract was made, and that Allen must have been cognizant of it, if not active in bringing it about.

In January, 1812, King was again at Abingdon. While there he staid at Allen's house. In the month of February, or the forepart of March, he started for his home in Kentucky. He stopped for the night at a house about sixty miles from Abingdon, and was never afterwards seen. He left his saddle-bags at the house where he stopped, and these were afterwards taken to Allen's house and opened by Allen's wife. When opened they were found to contain his clothing and a pocket-book. In the pocket-book were papers, but no money.

The deed from the Allens to Vint bears date November 16th, 1810, and was executed by Mrs. Allen on that day. It was not proved for record until May 7th, 1812. Its execution appears first to have been attested by three witnesses, and then, on the 27th April, 1812, at the request of Allen, by two more. The presumption is, therefore, that it had not been delivered before that time.

On the 6th April, 1812, Vint made his contract for the conveyance to Allen's children of one-half of the property covered by the two deeds. On the next day Vint executed his receipt for the payment of $11,600, part of the purchase-money. Part of this payment consisted of nine out of the ten notes given by Vint for the purchase of the King interest. It cannot for a moment be doubted that Allen had no title to these notes, and that Vint knew it. So far as appears by the testimony none of them were indorsed when surrendered, and seven out of the nine were payable to the children of King. The disappearance of King caused much excitement at the time, and was extensively known. The persons at whose house he stopped for the night had been suspected of his murder. Allen was poor, and in the summer following he and Vint were in jail together for debt. In the face of all these circumstances it is impossible to be-

lieve that Vint told the truth when in his answer to the cross-bill of Findlay he stated that he received the notes "as he believed from one who had a right to their possession, and whose right to transfer them to him was unquestionable."

As has been seen, Allen's deed could not have been delivered until after the 27th April, 1812. The presumption is, therefore, that payment for the property had not been made previous to that time. Allen was not a man to be trusted, even by Vint, with so large a payment as the nominal consideration required without a delivery of the deed. The deed had been drawn with great care, as the scrivener testifies, because the transaction was important. If the contract had been fully consummated in good faith at its date, there can scarcely be a doubt that the deed would have been at once perfected and proved for record. This, as we think, disposes of the theory that the property had been paid for by Vint with his stock of goods in 1810. Vint did not set up any such claim in any of his answers, and most assuredly he would have done so if it had been true. Besides that, no satisfactory testimony has been adduced in support of the claim. The only witnesses who testify upon the subject speak very indefinitely, and one of them makes some statements which are directly contradicted by well-established facts. In September, 1812, Vint himself stated, in an affidavit, "that on or about the 16th November, 1810, he purchased from Allen all his interest in the estate of William King, deceased, and after that, purchased from Allen all of the interest of Samuel King in said estate, for which he was to give and did give credit on a debt due from him to affiant for $10,000." There is nothing here about a payment in goods, and besides, according to the affidavit, the King purchase entered as much into the credit as did that of the Allen interest.

But still more important is the absolute refusal of Vint to disclose the facts in his answers when directly called upon to do so. It is true that he need not make the statements unless he chose. The law under the form of pleadings in

this case did not compel him to be more specific, but it can raise presumptions against him if he is not.   He may, if he pleases, rest his case upon the acknowledgment of payment expressed in his deeds, but if he does he must take the chances of being overcome by other facts and circumstances which repel the presumption arising from such evidence. In this case the circumstances are emphatic.   He slept upon his rights for a quarter of a century; he waited for every actor in the premises except himself to die; in all the litigation affecting his interests he never appeared so long as there was one alive who could speak against him from actual knowledge of the facts, and during all the time he permitted his adversaries to assume and represent his title.

But we are not inclined to pursue this inquiry further. To our minds it is clear that in April, 1812, when the transactions upon which the rights of the parties depend, were completed, it was well understood by all that the original interest of Mrs. Allen in the estate of her brother had been in some form secured to her children.   It is quite possible it may also have been understood that Vint was to have a lien upon it by way of security for the payment of some debt owing to him; but it is certain, as we think, that it was never intended he should hold it as owner.

When, therefore, Vint came into court and asserted his absolute title as against the ignorant heirs of these deceased contracting parties, and wilfully concealed his contract for a reconveyance and the receipt which belonged to it, he came with unclean hands and must suffer the consequences. He does not excuse himself for this attempted fraud by pleading defect of memory, but claims boldly that he was not required to tell all he knew; that his duty was at an end when, selecting his own facts, he presented his own case.   It is true he had the right to select that way of coming into court, but having deliberately made his selection he ought not to be surprised if he finds that he is received with suspicion.   Honesty of purpose prompts frankness of statement.   Concealment is indicative of fraud.

If Allen and Vint were the only parties interested in this

controversy the case would be different. They have been partners in fraud and neither can claim a preference over the other on account of honesty of purpose or fairness in dealing. But Allen's interest in the property was only that of a tenant for life. The real owner was his wife, and upon her death her children succeeded to her rights. It is the title of these children that Vint now attempts to defeat. By his own admissions in commencing his proceedings against them he concealed the truth. He thus in effect confesses that he relied to some extent for his success upon their ignorance. After years of groping in the dark, they were able to confront him with the facts and, as we think, to defeat the case he has attempted to make against them.

DECREE REVERSED, and the cause remanded with instructions to enter a decree DISMISSING THE BILL of the complainants and GRANTING THE PRAYER OF THE CROSS-BILL for a cancellation of the deed from Allen and wife to Vint.